UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* Mary Bozzelli,<br><br>*Plaintiff,*<br><br>*v.*<br><br>PHH MORTGAGE CORPORATION and PHH CORPORATION<br><br>*Defendants.* | QUI TAM COMPLAINT AND DEMAND FOR A JURY TRIAL<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3729 *et seq.*<br><br>Civil Action No. |

Relator Mary Bozzelli brings this qui tam action in the name of the United States of America, by and through her undersigned attorneys Thomas & Solomon LLP, and alleges as follows.

## INTRODUCTION

1.     This is a civil fraud action by qui tam Relator Mary Bozzelli on behalf of the United States ("the Government"), against Defendants PHH Mortgage Corporation and PHH Corporation ("PHH" or "Defendants") to recover penalties and damages arising from false statements and certifications Defendants made to the United States in connection with their mortgage lending business, including with respect to certifications made in connection with Defendants' efforts to increase its profits through various programs operated by the United States (individually and collectively, the "Government Programs").

2.     This action seeks to recover treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and civil penalties under the Financial

Institutions Reform, Recovery, and Enforcement Act, 12 U.S.C. § 1833a ("FIRREA").

3.      Defendants engaged in a regular practice of reckless origination and underwriting of mortgage loans participating in Government Programs.  As a result of Defendants' culture, practice and scheme to maintain aggressive efforts to continually increase profits by means including avoiding their fiduciary duties to the Government and their obligations to comply with the requirements set forth by the Government Programs, Defendants have improperly and knowingly presented or caused to be presented claims for payment to the Government that, upon information and belief, the Government would not have paid but for Defendants' false statements, including Defendants' certifications that it had complied with the Government Programs.

4.      Defendants have profited for years from its participation in the Government Programs while submitting false statements to the Government about its underwriting, processing, due diligence , and other aspects of compliance with the Government Programs. Defendants failed to implement quality control measures to stop its reckless lending practices.   Defendants' misconduct has resulted in damages to the Government, with additional losses expected in the future, as well as mortgage defaults and home evictions and foreclosures.

5.      The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" or who otherwise improperly makes false statements to the Government.  31 U.S.C. § 3729(a)(1)(A)-(G).  The False Claims Act further provides that any person who violates the Act "is liable to the United States Government for a civil

penalty ... plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

6.     Under the FCA, liability attaches when a Defendants submits or causes another to submit a claim for payment from Government funds that the Defendants knows is unwarranted and when false records or statements are knowingly made or used for obtaining approval of a false or fraudulent claim for Government funds.  Liability also attaches under the FCA when a Defendants knowingly makes, uses, or causes to be made, a false record or statement to conceal, avoid or decrease an obligation to pay to the Government.

7.     The FCA permits any person having information regarding a false or fraudulent claim for payment from Government funds to bring an action for himself as the Relator and for the Government and allow him to share in any recovery.

8.     Based on the foregoing provisions, Relator asserts violations of Federal law as a result of false claims made by Defendants in connection with the Government Programs.

9.     Relator seeks to recover all available damages, civil penalties, and all other relief available for expenditures impacted by Defendants' fraud, including treble damages and penalties under the FCA and FIRREA.  Damages owed to the Government include, but are not limited to, the full value of all reimbursements pursuant to Government Programs that the Government would not have paid but for Defendants' false claims and certifications, including Defendants' certification that it had complied with and was eligible to participate in the Government Programs.

10.    Defendants' wrongful practices include improperly and knowingly submitting or causing to be submitted false claims for reimbursement to Government Programs, by a scheme whose methods include applying pressure on loan officers and underwriters to

originate and approve more and more loans for participation in Government Programs as quickly as possible, failing to satisfy its duty to conduct proper due diligence in underwriting and processing mortgage applications submitted in connection with Government Programs, failing to provide sufficient training and guidance to its inexperienced staff, employing underwriters who were unqualified to properly perform their duties, among others.

11.     Defendants also improperly and knowingly presented or caused to be presented claims for payment on the basis of false statements and on the basis of false certifications that Defendants were in compliance with applicable standards and requirements of the Government Programs.

12.     Upon information and belief, the Government would not have paid those claims had it been aware of the falsity of Defendants' claims and certifications.

13.     Upon information and belief, the Government would not have permitted Defendants to participate in the Government Programs had it been aware of Defendants' false certifications of compliance with those programs and/or Defendants' culture, practices and scheme to increase profits through misuse of the Government Programs.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3732, conferring jurisdiction for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730, and pursuant to 28 U.S.C. § 1331, conferring jurisdiction over all civil actions arising under the laws of the United States.

15.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1), (b)(3), and (c) because Defendants can be found and transacts business in this judicial district.

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transacts business in this judicial district, and acts proscribed by 31 U.S.C. 3729 have been committed by Defendants in this District.  Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732(a).

17.     This suit is not based on prior public disclosure of allegations or transactions in a criminal, civil or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in the news media; or otherwise as the term "publicly disclosed" is defined in 31 U.S.C. § 3730, but rather information from Relator.

18.     In the alternative, to the extent there has been a public disclosure unknown to Relator, Relator is an original source as defined by the FCA.  Relator has direct and independent knowledge of the information on which these allegations are based, and witnessed directly the fraudulent actions and representations by Defendants against the Government.

19.     Relator shall concurrently serve a copy of this Complaint upon the United States.  Relator will also serve upon the United States a written disclosure statement setting forth and enclosing all material evidence and information he possesses, pursuant to the requirements of 31 U.S.C. § 3730(b)(2).

## THE PARTIES

20.     Defendants is a New Jersey corporation with a principal place of business located at 1 Mortgage Way, Mount Laurel, New Jersey, 08054.  Defendants conducts business throughout the United States.

21.     Relator is a resident of Williamstown, New Jersey.  From approximately

August 1992 through June 2011, Relator was employed by Defendants in Mount Laurel, New Jersey.   Throughout her employment with Defendants, Relator worked as an underwriter for Defendants, including as an Underwriting Supervisor from approximately 2002 to 2004, and as a post-closing underwriter from approximately 2008 to June 2011.

## FACTUAL BACKGROUND

### *Civil Statutes to Combat Mortgage Fraud*

22.    The False Claims Act provides liability for any person (i) who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"; or (ii) who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."   31 U.S.C. § 3729(a)(1)(A)-(B).   The False Claims Act further provides that any person who violates the Act "is liable to the United States Government for a civil penalty ... plus 3 times the amount of damages which the Government sustains because of the act of that person."   31 U.S.C. § 3729(a); *see* 28 C.F.R. § 85.3(a)(9).

23.    The Fraud Enforcement Recovery Act of 2009 ("FERA") amended the False Claims Act to define "claim" to include: "any request or demand, whether under a contract or otherwise, for money or property . . . made to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . ." 31 U.S.C. § 3729(b)(2).

24.    Congress enacted FIRREA in 1989 to reform the federal banking system. Toward that end, FIRREA authorizes civil enforcement of enumerated criminal predicate

offenses—as established by a preponderance of the evidence—that affect financial institutions and certain government agencies. *See* 12 U.S.C. § 1833a(e).

25.     FIRREA provides that the United States may recover civil penalties of up to $1 million per violation, or, for a continuing violation, up to $1 million per day or $5 million, whichever is less.  12 U.S.C. § 1833a(b)(1)-(2).  The statute further provides that the penalty can exceed these limits to permit the United States to recover the amount of any gain to the person committing the violation, or the amount of the loss to a person other than the violator stemming from such conduct, up to the amount of the gain or loss.  18 U.S.C. § 1833a(b)(3).

26.     FIRREA, *inter alia*, prohibits any person connected in any capacity with HUD from making any false entry in any book, report or statement of or to HUD with the intent to defraud HUD or any other body politic or to deceive any officer, auditor, examiner, or agent of HUD or of a department or agency of the US.

27.     FIRREA, *inter alia*, prohibits any person from knowingly making any false statement or report, or willfully overvaluing any land, property, or security, for the purpose of influencing in any way the action of Government Programs.

28.     FIRREA, *inter alia*, prohibits using the mails or wires for the purpose of executing a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

29.     FIRREA, *inter alia*, prohibits any person from, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully making any materially false, fictitious, or fraudulent statement or representation.

*The Government Programs*

30.     Defendants participate in numerous Government Programs in connection with their mortgage lending business including, *inter alia*, the FHA Mortgage Insurance Program ("FHA") of the United States Department of Housing and Urban Development ("HUD"), the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac"), and others (individually and collectively, the "Government Programs").

31.     The Government Programs require participants, including Defendants, to meet certain standards and requirements in connection with participation in the Government Programs, including requirements in connection with underwriting loans referred to the Government Programs.

32.     The Government Programs also require participants, including Defendants, to certify their compliance with the Government Programs for purposes of eligibility to participate in the Government Programs.

33.     The Government Programs also require participants, including Defendants, to certify compliance with the relevant standards and requirements with respect to the requirements and standards of the Government Programs with respect to each specific mortgage loan submitted for inclusion in the Government Programs.

34.     The following are a non-exhaustive description of the standards and requirements set forth by the Government Programs.

*The FHA Mortgage Insurance Program*

35.     FHA, a part of HUD, is the largest mortgage insurer in the world, insuring approximately one third of all new residential mortgages in the United States.  Pursuant to the National Housing Act of 1934, FHA offers various mortgage insurance programs.

Through these programs, FHA insures approved lenders ("mortgagees") against losses on mortgage loans made to buyers of single-family housing.  FHA mortgage insurance encourages lenders to make loans to creditworthy borrowers who nevertheless might not meet conventional underwriting requirements.  Under HUD's mortgage insurance programs, if a homeowner defaults on a loan and the mortgage holder forecloses on the property, HUD will pay the mortgage holder the balance of the loan and assume ownership and possession of the property.  HUD also incurs expenses in managing and marketing the foreclosed-upon property until it is resold.  FHA mortgage insurance makes mortgage loans valuable in the secondary markets, as FHA loans are expected to have met HUD requirements and because they are secured by the full faith and credit of the United States.

36.    HUD's Direct Endorsement Lending program is one of the FHA-insured mortgage programs.  A Direct Endorsement Lender is authorized to underwrite mortgage loans, decide whether the borrower represents an acceptable credit risk for HUD, and certify loans for FHA mortgage insurance without prior HUD review or approval.  To qualify for FHA mortgage insurance, a mortgage must meet all of the applicable HUD requirements (*e.g.*, income, credit history, valuation of property, etc.).

37.    HUD relies on the expertise and knowledge of Direct Endorsement Lenders in providing FHA insurance and relies on their decisions.  A Direct Endorsement Lender is therefore obligated to act with the utmost good faith, honesty, fairness, undivided loyalty, and fidelity in dealings with HUD.  The duty of good faith also requires a Direct Endorsement Lender to make full and fair disclosures to HUD of all material facts and to take on the affirmative duty of employing reasonable care to avoid misleading HUD in all circumstances.

*FHA Underwriting and Due Diligence Requirements*

38.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. The underwriter must "evaluate [each] mortgagor's credit characteristics, adequacy and stability of income to meet the periodic payments under the mortgage and all other obligations, and the adequacy of the mortgagor's available assets to close the transaction, and render an underwriting decision in accordance with applicable regulations, policies and procedures." 24 C.F.R. § 203.5(d). In addition, the underwriter must "have [each] property appraised in accordance with [the] standards and requirements" prescribed by HUD. 24 C.F.R. § 203.5(e)

39.     Mortgagees must employ underwriters who can detect warning signs that may indicate irregularities, as well as detect fraud, in addition to the responsibility that underwriting decisions are performed with due diligence in a prudent manner. HUD Handbook 4000.4 REV-1, ¶ 2-4(C)(5); *see also* HUD Handbook 4155.2 ¶ 2.A.4.b. The lender must also maintain a compliant compensation system for its staff, an essential element of which is the prohibition on paying commissions to underwriters.

40.     HUD relies on Direct Endorsement Lenders to conduct due diligence on Direct Endorsement loans. The purposes of due diligence include (1) determining a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties and (2) examining a property offered as security for the loan to determine if it provides sufficient collateral. Due diligence thus requires an evaluation of, among other things, a borrower's credit history, capacity to pay, cash to close, and collateral. In all cases, a Direct Endorsement Lender owes HUD the duty, as prescribed by federal regulation, to exercise the same level of care which it would exercise in obtaining and

verifying information for a loan in which the mortgagee would be entirely dependent on the property as security to protect its investment.

41.     HUD has set specific rules for due diligence predicated on sound underwriting principles.  In particular, HUD requires Direct Endorsement Lenders to be familiar with, and to comply with, governing HUD Handbooks and Mortgagee Letters, which provide detailed processing instructions to Direct Endorsement Lenders.    These materials specify the minimum due diligence with which Direct Endorsement Lenders must comply.

42.     With respect to ensuring that borrowers have sufficient credit, a Direct Endorsement Lender must comply with governing HUD Handbooks, such as HUD 4155.1, *Mortgage Credit Analysis for Mortgage Insurance on One-to-Four-Family Properties*, to evaluate a borrower's credit.    The rules set forth in HUD 4155.1 exist to ensure that a Direct Endorsement lender sufficiently evaluates whether a borrower has the ability and willingness to repay the mortgage debt.

43.     To properly evaluate a borrower's credit history, a Direct Endorsement Lender must, at a minimum, obtain and review credit histories; analyze debt obligations; reject documentation transmitted by unknown or interested parties; inspect documents for proof of authenticity; obtain adequate explanations for collections, judgments, recent debts and recent credit inquiries; establish income stability and make income projections; obtain explanations for gaps in employment, when required; document any gift funds; calculate debt and income ratios and compare those ratios to the fixed ratios set by HUD rules; and consider and document any compensating factors permitting deviations from those fixed ratios.

44.     With respect to appraising the mortgaged property (*i.e.*, collateral for the loan), a Direct Endorsement Lender must ensure that an appraisal and its related documentation

satisfy the requirements in governing HUD Handbooks, such as HUD 4150.2, *Valuation Analysis for Home Mortgage Insurance*. The rules set forth in HUD 4150.2 exist to ensure that a Direct Endorsement Lender obtains an accurate appraisal that properly determines the value of the property for HUD's mortgage insurance purposes.

*FHA Quality Control Requirements*

45.     Furthermore, to maintain HUD-FHA approval, a Direct Endorsement Lender must implement and maintain a quality control program. HUD requires the quality control department to be independent of mortgage origination and servicing functions. To comply with HUD's quality control requirements, a lender's quality control program must (among other things): (a) review a prescribed sample of all closed loan files to ensure they were underwritten in accordance with HUD guidelines; and (b) conduct a full review of all loans going into default within the first six payments, which HUD defines as "early payment defaults."

46.     In conducting a quality control review of a loan file, the lender must, among other things, review and confirm specific items of information.

47.     The HUD Handbook lays out a rating system for the quality control reviews, in which the lender implements a system of evaluating each Quality Control sample on the basis of the severity of the violations found during the review.

48.     Under HUD's rules, a lender must report to HUD (along with the supporting documentation) "[s]erious deficiencies, patterns of non-compliance, or fraud uncovered by mortgagees" during the "normal course of business and by quality control staff during reviews/audits of FHA loans" within 60 days of the initial discovery. HUD Handbook 4060.1 REV-1, CHG-1, ¶¶ 6-13, 6-3(J); *see also* HUD Handbook 4060.1 REV-2, ¶ 7-3(J)

(requiring Direct Endorsement Lenders to "immediately" report findings of "fraud or other serious violations" affecting an FHA loan); HUD Handbook 4060.1 REV-2, ¶2-23 ("Mortgagees are required to report to HUD any fraud, illegal acts, irregularities or unethical practices.) Upon making such findings, the lender must also expand the scope of the quality control review both by increasing the number of files reviewed and conducting a more in-depth review of the selected files.

49.     Until 2005, HUD's rules instructed Direct Endorsement Lenders to make the required self-reports of loans with serious deficiencies, patterns of noncompliance, or fraud in writing to HUD through the Quality Assurance Division of the HUD Homeownership Centers ("HOCs") having jurisdiction. In May 2005, HUD issued Mortgagee Letter 2005-26, which notified lenders that going forward they would have to participate in electronic reporting through HUD's online Neighborhood Watch system. The new method became mandatory at the end of November 2005, and required mortgagees "to report serious deficiencies, patterns of noncompliance, or suspected fraud, to HUD in a uniform, automated fashion" and in lieu of written reports to the various HOCs.

50.     In addition to reporting loans affected by fraud or other serious violations to HUD, the lender is required to take corrective action in response to its findings. In particular, quality control review findings must be reported to the mortgagee's senior management within one month of completion of the initial report and management must take prompt action to deal appropriately with any material findings. The final report or an addendum must identify the actions being taken, the timetable for their completion, and any planned follow-up activities. Appropriate action by management includes following up with underwriters responsible for material findings to ensure that they are properly trained and

diligently reviewing each file before endorsing it for FHA mortgage insurance.

*FHA Direct Endorsement Lender Certifications*

51.     Every Direct Endorsement Lender, including Defendants, must make an annual certification of compliance with the program's qualification requirements, including due diligence in underwriting and the implementation of a mandatory quality control plan (the "Annual Certification"). The Annual Certification states, in sum or substance:

> I know or am in the position to know, whether the operations of the above named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees including those of its HUD-FHA approved branch offices.

Absent a truthful Annual Certification, a lender is not entitled to maintain its direct endorsement lender status and is not entitled to endorse loans for FHA insurance.

52.     In addition to the Annual Certification requirement, after each mortgage closing, the Direct Endorsement Lender must certify that the lender conducted due diligence and/or ensured data integrity such that the endorsed mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A. For each loan that was underwritten with an automated underwriting system approved by FHA, the lender must additionally certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable)." *Id*. For each loan that required manual underwriting, the lender must additionally certify that the underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage. ..." *Id*. HUD relies

on each certification to endorse the loan and provide the lender with a mortgage insurance certificate.

### The Other Government Programs

53.     Defendants also participate in other Government Programs, including, *inter alia*, Fannie Mae and Freddie Mac.

54.     Fannie Mae and Freddie Mac are government-sponsored enterprises ("GSEs") chartered by Congress with a mission to provide liquidity, stability, and affordability to the United States housing and mortgage markets.  Fannie Mae is located at 3900 Wisconsin Avenue, NW in Washington, D.C.  Freddie Mac is located at 8200 Jones Branch Drive in McLean, Virginia.

55.     As part of their mission, Fannie Mae and Freddie Mac purchase single-family residential mortgages from mortgage companies and other financial institutions, providing revenue that allows the mortgage companies to fund additional loans.  The GSEs then either hold the loans in their investment portfolios or bundle them into mortgage-backed securities ("MBS") that they sell to investors.

56.     The GSEs earn revenue in their single-family business line primarily from "guarantee fees," *i.e.*, fees received as compensation for guaranteeing the timely payment of principal and interest on mortgage loans pooled into MBS.  In general, the GSEs are profitable so long as their income from investments and guarantee fees exceeds the principal and interest that they must pay out on any defaulted loans that they guarantee.

57.     Prior to late 2007, GSE preferred stock was widely regarded to be a safe investment.  In fact, federal regulators permitted banks to invest up to 100 percent of their investment capital in GSE preferred securities.  In the second half of 2007 and the first half

of 2008, however, as the default rates on defaulted loans climbed, Fannie Mae lost $9.5 billion and Freddie Mac lost $4.7 billion. Accordingly, Fannie Mae's Form 10-K for 2007 reported a "material increase in mortgage delinquencies and foreclosures . . ." and expected "increased delinquencies and credit losses in 2008 as compared with 2007."

58.    On July 30, 2008, pursuant to the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified at 12 U.S.C. § 4617), Congress created the Federal Housing Finance Agency ("FHFA"), a federal agency, to ovesee Fannie Mae, Freddie Mac, and the Federal Home Loan Banks. The FHFA is located at Constitution Center, 400 7th Street, SW in Washington, D.C.

59.    On September 6, 2008, pursuant to HERA and in response to the insolvency of the GSEs due to mortgage defaults and delinquencies, the Director of FHFA placed Fannie Mae and Freddie Mac into conservatorships and appointed FHFA as conservator. In that capacity, FHFA has the authority to exercise all rights and remedies of the GSEs. 12 U.S.C. § 4617(b)(2).

60.    Simultaneous with the placement of Fannie Mae and Freddie Mac into conservatorships, the United States Department of Treasury ("Treasury") exercised its authority under HERA to "purchase any obligations and other securities" issues by the GSEs and began to purchase preferred stock pursuant to the Senior Preferred Stock Purchase Agreements ("PSPAs").

61.    On September 7, 2008, following the conservatorship of Fannie Mae and Freddie Mac and Treasury's purchase of GSE preferred stock, the value of the GSEs' stock was eliminated. As a result, certain community banks that had concentrated investments in GSE preferred stock failed entirely, and others suffered significant losses. The failure of these

community banks has led to billions of dollars in losses to the Deposit Insurance Fund.

62.     Since the conservatorship, Treasury has made quarterly capital contributions to each of the GSEs.  As of December 31, 2012, Treasury has provided more than $187 billion in support to the GSEs.  These federal funds have been used primarily to cover losses from single-family mortgages purchased and guaranteed by the GSEs between 2004 and 2008, but have also been used to purchase mortgages sold in 2009 from lenders including Defendants, and to reimburse losses incurred by the GSEs as a result of guaranteeing those mortgages.  Since 2008, the GSEs have suffered net losses of $208 billion in their single-family mortgage business.

*Fannie Mae and Freddie Certifications*

63.     In purchasing loans for their single family business, GSEs operate on a "rep and warrant model" relying on lenders' representations and warranties that their loans comply in all respects with the standards outlined in the GSE selling guides and lender sales contracts, which set forth underwriting, documentation, quality control, and self-reporting requirements.  Specifically, the loans sold to Fannie Mae must comply with its Single Family Selling Guide (the "Selling Guide").  Loans sold to Freddie Mac must comply with its Single-Family Seller/Servicer Guide (the "Freddie Guide") and purchase contracts.

64.     The purchase contracts between a GSE and a lender include both a long-term master agreement that supplements the relevant selling guide and short-term contracts that grant variances or waivers from the selling guide requirements to permit a lender to sell a specific loan product.  The GSEs typically renegotiate such variances on an annual basis based on the performance of the applicable loan product and other factors, and may decide to adjust the pricing on the affected loans for the following year or eliminate the variance

altogether.

65. The rep and warrant model operates on the assumption that the sellers of the loans—usually also the originators of the loan—are in a superior position of knowledge about the quality of those loans. Lenders assume certain obligations in accordance with their superior position of knowledge, such as the duty to perform prudent underwriting and quality assurance checks as required by the guidelines, and to self-report loans they identify as fraudulent, noncompliant with GSE guidelines, or otherwise materially defective. The GSEs also delegate the underwriting of the loans they purchase to the lenders. Although the GSEs reserve the right to sample a portion of the loans they purchase to ensure compliance with the guidelines, they generally conduct full file reviews only if a loan goes into default.

66. Upon information and belief, Defendants entered into a Mortgage Selling and Servicing Contract (the "Master Contract") with Fannie Mae. As set forth in that Master Contract, in sum or substance, Defendants as lender made several specific warranties regarding each mortgage, including warranties that its mortgage conforms to all applicable requirements in the Guides and the Master Agreement, and that Defendants knows nothing involving the mortgage, the property, the mortgagor, or the mortgagor's credit standing that can reasonably be expected to: (i) cause private institutional investors to regard the mortgage as an unacceptable investment; (ii) cause the mortgage to become delinquent; or (iii) adversely affect the mortgage's value or marketability.

67. Upon information and belief, the relevant agreements expressly affirmed that Defendants' representations apply in their entirety to each mortgage it sold to Fannie Mae, were made as of the date transfer is made, and continue after the purchase of the mortgage.

68. In representing to Fannie Mae that the loan sold to the GSEs is an acceptable

investment, Defendants further warranted that: (i) all required loan data is true, correct, and complete; (ii) automated underwriting conditions are met for loans processed through an automated underwriting system, and (iii) no fraud or material misrepresentations has been committed by any party, including the borrower.  These requirements were set forth in the Selling Guides, and remain in effect today.

69.     Defendants further warranted that its quality control department takes certain post-closing measures intended to detect problems with loan manufacturing quality, including: (i) reviewing data integrity within automated underwriting systems; (ii) re-verifying underwriting decisions and documents; (iii) re-verifying fieldwork documents (including as to appraisal and title); (iv) reviewing closing and legal documents; and (v) conducting regular reviews of internal controls relating to loan manufacturing quality and fraud prevention.  These requirements were set forth in the yearly versions of the Selling Guide.

70.     Similarly, the Freddie Guide provides that "[a]s of the Delivery Date, the Funding Date and the date of any substitution of Mortgages pursuant to the Purchase Documents, the Seller warrants and represents the following for each Mortgage purchased by Freddie Mac: (1) The terms, conditions, and requirements stated in the Purchase Documents [defined to include the guidelines and contacts] have been fully satisfied; (2) All warranties and representations of the Seller are true and correct; (3) The Seller is in compliance with its agreements contained in the Purchase Documents; [and] (4) The Seller has not misstated or omitted any material fact about the Mortgage."  These representations were set forth in the yearly versions of the Freddie Guide.

71.     Upon information and belief, Defendants entered into a Master Agreement

with Freddie Mac that provides, in sum or substance, that Defendants as seller complied with all requirements of the *Freddie Mac Single-Family Seller/Servicer Guide* and the other Purchase Documents, as modified and supplemented by the terms of the Master Agreement.

72.    Defendants' representations that it was underwriting and delivering investment-quality mortgages according to the GSEs' selling guides and contractual requirements were material to the GSEs' decisions to purchase mortgage loans.

73.    When a GSE identifies a material breach of a warranty, usually during a post-default quality review of a loan, it may demand that the lender repurchase the loan and/or reimburse the GSE for any loss incurred.

*Defendants Participated in Other Government Programs*

74.    In addition to the foregoing, Defendants also participated in, and falsely certified loans to the Government in connection with, other Government Programs.

75.    For example, Defendants participated in home mortgage programs run by the Veteran's Administration (the "VA Home Loans").   VA Home Loans are loans provided by private lenders, such as Defendants, and guaranteed in part by the Government to enable veterans to obtain more favorable loan terms.

76.    In connection with VA Home Loans, Defendants certified to the Government, in sum or substance that the loan application, all verifications of employment, deposit, and other income and credit verification documents have been processed in compliance with 38 C.F.R. part 36; that all credit reports obtained in connection with the processing of the borrower's loan application have been provided to VA; that, to the best of the lender's knowledge and belief, the loan met the underwriting standards recited in Chapter 37 of title 38 United States Code and 38 C.F.R. Part 36; and that all information provided in support

of the loan was true, complete, and accurate to the best of the lender's knowledge and belief.

***Defendants' Practices and Systematic Efforts to Maximize Profits From Government Programs***

77.     The Government Programs rely upon participants, including Defendants, to diligently comply with the requirements and standards set forth by the Government Programs and to certify compliance, both with respect to participation in the Government Programs and/or with respect to individual loans referred for participation in the Government Programs.

78.     Defendants, however, sought to maximize profits from the Government Programs by ignoring underwriting, quality and other standards in an effort to increase loan volume, contrary to its certifications and representations to the Government.

79.     Defendants required underwriters to make loan decisions on extremely short turnaround times and employed lax and inconsistent underwriting standards and controls which failed to comport with the standards and requirements of the Government Programs. The heavy volume of loans overwhelmed underwriters, further contributing to extremely poor loan quality.  Moreover, particularly during busy periods, Defendants attempted to further increase loan volume by permitting unqualified and inadequately trained individuals to underwrite loans.  Defendants improperly waived and ignored conditions underwriters had placed on loan approvals to permit the loans to close even where necessary and proper conditions had not been met.  Through these and a variety of other practices, Defendants increased its loan volume at the expense of Government requirements and standards, all in contradiction to Defendants' certifications of compliance with the Government Programs.

80.     As a prerequisite to participating in the Government Programs, Defendants expressly certified (or, through participation in the Government Program, impliedly certified)

its compliance with the requirements of the Government Programs. Additionally and/or in the alternative, in submitting each loan for insurance or other participation in a Government Program, Defendants expressly or impliedly certified that it had complied with the requirements of the Government Program in submitting that loan.

81.    Defendants, however knowingly and/or recklessly caused to be made or used false records or statements, including for example the false certifications and representations of compliance with the Government Programs which Defendants caused to be made in connection with its participation in the Government Programs and/or when it submitted loans for insurance and/or for payment or reimbursement.

82.    Defendants engaged in pervasive and systematic efforts to increase its profits by submitting or causing to be submitted to the Government claims for payments and reimbursements in connection with the Government Programs that the Government, upon information and belief, would not have made but for Defendants' false certifications of compliance with the requirements of the Government Programs.

83.    Defendants' failure to comply with the requirements of the Government Programs extends, upon information and belief, to each of Defendants' locations as part of Defendants' efforts to maximize its profits.

84.    Defendants' failure to comply with the requirements of the Government Programs was, upon information and belief, caused and communicated by Defendants' management and managers to underwriters and other employees and staff company-wide.

85.    Defendants engaged in a regular practice of reckless origination and underwriting of its loans and falsely certified and represented to the Government that loans were eligible for participation in the Government Programs.

86.     The quality of Defendants' loans was affected by Defendants' practices, including lax and inconsistent underwriting standards and controls, pressure and directives to underwriters to violate or avoid requirements and standards of the Government Programs, Defendants' failure to provide sufficient training to its staff, Defendants' use of unqualified individuals to underwrite loans, Defendants' failure to properly process and close loans, Defendants' failure to undertake proper and sufficient quality control processes, and others.

87.     Defendants' management was aware, or should have been aware, that such practices resulted in the endorsement of loans for participation in the Government Programs that did not comply with applicable standards and requirements.  Defendants' management, however, failed to take effective action to address deficiencies in its loan origination and underwriting practices.   Instead, Defendants reaped profits by certifying that its entire portfolio of loans met the applicable standards and requirements and were therefore eligible to participate in Government Programs.  As a result of Defendants' loan certifications, the Government has suffered damages as a result of defaulted loans participating in Government Programs when Defendants knew, or should have known, those loans did not meet the applicable standards and requirements and were ineligible to participate in Government Programs.

88.     Defendants abused its Direct Endorsement Lender status through its false and fraudulent certifications to the Government.  As a Direct Endorsement Lender, Defendants regularly violated applicable standards and requirements, prudent underwriting practices, and Defendants' duties to the Government by failing to conduct proper due diligence on mortgages that it reviewed and approved for participating in the Government Programs and by failing to comply with applicable quality control standards and requirements.  Despite

their repeated violations of applicable standards and requirements, Defendants falsely certified, both annually and on a loan-by-loan basis, that they had complied with those standards and requirements, and that the mortgages they endorsed were eligible. Upon information and belief, had the Government known that Defendants' mortgage eligibility certifications were false, the Government would not have permitted Defendants to endorse those loans, nor would it have permitted Defendants to maintain its status as a Direct Endorsement Lender.

*Defendants' Reckless, Negligent and/or Grossly Negligent Underwriting Practices*

89.     Defendants knew or should have known that its certifications of compliance were false. In the alternative, in falsely certifying compliance, Defendants acted with deliberate ignorance and/or reckless disregard of the truth. In the alternative, Defendants' false certifications, as well as its failure to implement proper underwriting practices and procedures, were reckless, grossly negligent and/or negligent.

90.     Defendants' false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of Government Program standards and requirements, violated Defendants' fiduciary obligations and duty of care to the Government.

91.     As set forth above, the Government Programs require a lender to represent that the underwriting conditions are met for all loans processed through the lender's system. As part of both the annual certifications and individual loan certifications, Defendants certified that they complied with the required level of quality control and duty of care.

92.     Contrary to Defendants' certifications and representations to the Government that they complied with requirements of the Government Programs, as well as the individual certifications appearing on each and every mortgage endorsed by Defendants, Defendants

engaged in reckless, negligent, and grossly negligent underwriting practices in violation of applicable standards and requirements.

93.     Defendants' loan quality issues include Defendants' emphasis and pressure on underwriters to approve as many loans as possible, at as high a rate as possible, churning out loans at a rapid pace that were then passed on to the Government.

94.     The underlying cause of Defendants' loan quality issues were Defendants' overall mantra to "think outside the box" which meant that underwriting personnel were to approve loans by deliberately disregarding the loan requirements of the Government Programs.  Defendants did not emphasize compliance with the government regulations, but instead focused on finding ways to get loans approved in the fastest possible way.  The instances set forth herein are non-exhaustive examples of some of those activities.

95.     The underlying causes of Defendants' serious loan quality problems and reckless underwriting are multifold.   Since approximately 2000, Defendants made concentrated efforts to substantially increase its loan origination.   To facilitate this substantial increase in loan origination, Defendants expanded its staff, including hiring temporary underwriters to review loans processed under the Government Programs.  Many of these employees were not adequately trained with respect to the requirements of the Government Programs.

96.     Defendants' senior management was aware that these employees had not received the in-depth training necessary to properly underwrite these loans and to adhere to the regulations of the Government Programs.

97.     Relator Mary Bozzelli was aware that the temporary employees did not have knowledge of the requirements of the Government Programs because they would come to her

to ask basic questions about underwriting process for Government Programs. In particular, the temporary employees were especially unqualified in regards to calculating the debt-to-income ratios as required by the Government Programs.

98.     Underwriters were repeatedly told by Defendants' management to "think outside the box" to ignore the requirements of the Government Programs; to "interpret" the file in a way that would permit approval; and to "use your imagination" to find a way to approve a loan. The emphasis was not on finding a way to make the most appropriate decision, but instead to rapidly find any way to get a file approved.

99.     Underwriters were instructed to ignore the express requirements and standards of Government Programs and to instead focus on the "strength of the file." For example, managers made comments to underwriters to the effect that, where a borrower had a strong FICO score, the underwriter should undertake a more cursory review than a full underwrite.

100.    In addition to facing heavy pressure to approve loans, underwriters also were pressured to process as many loans as quickly as possible which necessarily meant that files were not being appropriately reviewed and thus approvals granted not on the strength of the file, but because Defendants pressured the underwriters to "process" the file and in doing so to "make it happen." Managers required that each underwriter process a minimum number of loans each day, but the numbers set made it difficult for underwriters to accurately complete their work in the time available.

101.    Managers would direct underwriters to approve questionable loans because it was unlikely that any particular loan would be audited, often noting that they "we're covered" even if the loan was audited.

102.    Underwriters were not reprimanded for approving loans, but those who did not

approve loans were called in for one-on-one sit down meetings with management.

103. Managers told underwriters they were simply passing on the pressure received from higher levels of management, based upon internal reports regarding underwriter activity.

104. Defendants tracked individual underwriters' rates of decisioning, approving, pending and declining loans. Each month underwriters were given reports showing their own rates as well as those of other underwriters.

105. Defendants also tracked performance data of the various underwriting teams and provided monthly reports to underwriters demonstrating the approval percentage of their underwriting team as opposed to other teams. Underwriters with lower approval rates were chastised for "bringing down" their underwriting teams.

106. If an underwriter failed to approve a loan because it did not meet the appropriate guidelines, the decision would typically be reversed either by passing the loan to a different underwriter, or management could still find ways to get it approved.

107. When loans were declined, Defendants' managers referred declined loans to select underwriters who Defendants felt were more likely to follow Defendants' suggestions to ignore the Government regulations. Approximately 50% of loans that were initially declined but sent for a second review to a different underwriter were subsequently approved, despite the fact that the underlying documentation and numbers used in the underwriting process was exactly the same as in the first review.

108. Defendants ostracized and penalized underwriters that adhered to the government regulations because it resulted in fewer approvals. Underwriters who adhered closer to the government regulations were given a reputation by Defendants' management to other employees as "tough."

109.   Defendants' underwriters were encouraged to decision nine loans per day. However, as underwriters were instructed to process no less than nine loans per day despite the fact that that was not sufficient time to review the file with the required level of care and therefore Defendants required loans to be reviewed in a negligent and reckless manner.

***Defendants Failed to Conduct Due Diligence in Accordance with Applicable Standards and Requirements***

110.   On a loan by loan basis, Defendants repeatedly lied to the Government Programs in order to obtain approval of mortgages through the Government Programs of mortgages that never should have been approved. These mortgages were not eligible under the required criteria of each Government Program.   Notwithstanding the mortgages' ineligibility, Defendants' underwriters endorsed the mortgages by falsely certifying that they had conducted the due diligence required by the Government Programs' rules and regulations when, in fact, they had not.   By endorsing ineligible mortgages and falsely certifying compliance with the government programs, Defendants wrongfully obtained approval of these ineligible mortgages.

111.   Contrary to Defendants' certifications and representations to the Government, as well as the individual certifications appearing on each and every mortgage endorsed by Defendants, Defendants failed to conduct due diligence in accordance with applicable standards and requirements as well as sound and prudent underwriting principles.

112.   Defendants knew or should have known that its certifications of compliance were false.   In the alternative, in falsely certifying compliance, Defendants acted with deliberate ignorance and/or reckless disregard of the truth.   In the alternative, Defendants' false certifications, as well as its failure to conduct proper due diligence, were reckless, grossly negligent and/or negligent.

113.    As set forth above, the Government Programs require a lender to represent that the underwriting conditions are met for all loans processed through the lender's system. As part of both the annual certifications and individual loan certifications, Defendants certified that it complied with the required level of due diligence for each loan.

114.    Contrary to Defendants' certifications and representations to the Government, Defendants did not comply with the rules and regulations of the Government Programs in reviewing and approving loans and did not exercise due diligence in underwriting mortgages.

115.    Instead, Defendants employed a wide range of strategies and efforts to avoid compliance with the Government Programs, in violation of their certifications to the Government.

116.    Violations of the Government Programs' underwriting and due diligence requirements included a failure to verify the applicant's employment, the approval of loans with unacceptable debt-to-income ratios without compensating factors, inadequate documentation of assets and gift funds, and a failure to identify fabricated and falsified income and asset documentation. This pattern of false certifications is illustrated by the examples below. These examples were not isolated events, but rather provide a representative sample of Defendants' fraudulent practices.

117.    When the automated system determined, based upon Defendants' data entry, that a loan was acceptable, underwriters were required to approve that loan rather than applying their own judgment and discretion, even in instances where the underwriter's experience suggested that the automated system should not have approved the file. Underwriters were told that they did not need to worry about approving those loans because it had passed the automated system and therefore the underwriter's individual DE number

was not on the line.

118.   On the other hand, when the automated system did not approve a loan, Defendants found numerous ways to manipulate the system, in violation of applicable standards and regulations, for purposes of approving the loan.

119.   Managers would also "adjust" data entered into the system, including for example income or asset values.

120.   In the period of time after Defendants began using the Government's automated system, managers and/or underwriters would adjust and re-run loans that had been referred and, therefore, should have been subject to manual underwriting.

121.   In some instances when the automated system for one Government Program referred a loan for more stringent manual underwriting, Defendants would instead submit the same loan for automated review to a different Government Program, which could result in an approval (rather than a refer) from the second program.  In these instances, Defendants knew that issues with the file suggested further review and underwriting was appropriate, but Defendants ignored that knowledge and instead simply processed the loan as though it had not previously been referred.

122.   Where underwriters raised issues or concerns with managers, the managers effectively trained the underwriters to ignore applicable standards and regulations by directing the underwriter to overlook or ignore a requirement and instead assuring the underwriter that, for example, "HUD allows that."  Underwriters often conveyed these instructions to each other informally, resulting in lax approaches being applied to numerous loans.

123.   Defendants required underwriters to document in a computer program called

"CASH" the reasons why the underwriters were making decisions that contradicted the requirements of the Government Programs. When a loan did not meet the guideline requirements for the Government Programs, underwriters needed to type a brief description of the "workarounds" that they used to manipulate the approval process. However, despite conscientiously flagging issues with non-conforming loans via this process, the internal reports made on "CASH" were rarely submitted to the government.

124. When an underwriter approved a loan subject to certain conditions, the required conditions were often waived by an underwriting manager, or by loan processors or their managers.

125. In the event that a manager subsequently "waived" a condition that an underwriter initially flagged, the CASH system was also used for managers to note why they waived the conditions. Underwriters were expected to then review the managerial notes in the CASH system and to "learn" what conditions should be ignored in the future.

126. Underwriters that did not adhere to Defendants' requirements on the waiving of conditions were reprimanded. For example, underwriters that did not subsequently waive conditions that managers waived via the CASH system would be subject to adverse employment actions, including termination.

127. Where an underwriter identified issues with a particular file, underwriters were encouraged and pressured to conditionally approve the loan, rather than pending the loan until the issues could be corrected. Underwriters were further incentivized to approve, rather than pend, loans because when a pended loan would later be returned to the underwriter for additional review but, because it did not count toward the underwriter's required daily minimum processing requirements, made it even more difficult for the underwriter to

complete his or her work.

128.   Even where the Government Program's automated system required certain conditions for approval, those conditions were waived, rather than satisfied, prior to closing.

129.   Additionally, loan processors who were permitted to clear conditions often permitted loans to close where the conditions had not been satisfied.

130.   In some instances, the loan processor, who was not trained regarding requirements of the Government Programs, would fail to adequately check that the documentation provided in fact supported the condition.   For example, if a condition required an additional pay stub to confirm income, the loan processor would clear the condition upon receipt of the additional pay stub even where that document showed a significant decrease in income and, therefore, did not actually satisfy the condition.

131.   Additionally, sales managers were permitted to clear or waive conditions, including overriding conditions put into place by the underwriter.

132.   Underwriters often complained that they were putting a condition on a file but knew it would be waived without being properly satisfied.

133.   Defendants also instructed and required underwriters to undertake a range of strategies to approve loans that circumvented or violated the applicable standards and regulations.   The following are some non-exhaustive examples of the wide variety of strategies employed.

134.   Defendants would approve loans where proper verification had not been obtained.   For example, income would be inflated by including a second job that did not qualify and/or had not been properly verified; income would be inflated by "grossing up" certain nontaxable income without proper verification.

135.   Defendants approved loans where the required documentation did not meet the required standards of authenticity.  For example, Defendants would verify a borrower's employment via only a quick "Google search" and not by actually calling an individual's employer.

136.   Where Defendants obtained additional information that was not required for underwriting purposes, such as for example additional tax returns, Defendants would fail to take into account additional issues indicated by that paperwork, including for example alimony or child support obligations that the borrower had failed to disclose.

137.   Defendants also accepted information that was not permissible in reviewing a borrower's credit scores.  For example, Defendants frequently took credit references from unqualified credit entities such as Rent-A-Center that did not have actual credit scores. Defendants frequently used pieces of credits that were impermissible to use under the required due diligence standards.

138.   Where a second credit report run prior to closing indicated that a borrower's credit score had dropped since the initial application and approval, Defendants would intentionally ignore the poor credit report and instead rely on the earlier, no longer accurate, credit report.

139.   Defendants failed to obtain complete and proper documentation for overtime or bonuses for the required length of time.

140.   For a significant period of time, Defendants instructed underwriters that they were not to contradict the word of the borrower and, therefore, where a borrower provided a letter setting forth relevant information the underwriter was not permitted to question that information or to obtain proper verification of the information.

141.    Defendants failed to properly include the cost of required repairs in the amount of cash required to close.  Even where underwriters attempted to require a showing of adequate cash to close as a condition, managers said that requirement was "easy to waive."

142.    Defendants, improperly and in violation of the requirements of the Government Programs, sought and obtained additional appraisals for purposes of obtaining a higher value on a property.  Defendants failed to disclose or properly document these instances, but instead simply ignored the first, unfavorable appraisal.

143.    Defendants engaged in a variety of other strategies and specific instances of avoiding, subverting and violating the standards and requirements of the Government Programs.

***Defendants' False Loan-Level Certifications Involving the Use of Underwriting Assistants***

144.    Under the DEL program, neither the FHA nor HUD reviews a loan before it is endorsed for FHA insurance.  Consequently, it is crucial that DELs follow the DEL program rules in determining which loans to approve for FHA insurance.  One of these program rules is the rule requiring that DELs employer registered underwriters ("DE underwriters") to conduct due diligence on loans before endorsing them for FHA insurance.

145.    There are numerous requirements that must be met before an underwriter can serve as a DE underwriter, and thereby review and approve loans for FHA insurance.  Among other things, the underwriter must have a minimum of three years full-time recent experience reviewing both credit applications and property appraisals.  The underwriter must also be a reliable and responsible professional skilled in mortgage evaluation, and must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting.

146.   In addition, the underwriter must be registered with the FHA. The only way that an underwriter can become registered with the FHA is if a DEL registers him or her. Moreover, when a DEL registers an underwriter with the FHA, it certifies to the FHA that the underwriter has the necessary qualifications.

147.   Once a DEL has registered an underwriter as a DE underwriter, the underwriter is assigned a unique identification number (a "CHUMS ID"). Whenever a DE underwriter approves a loan for FHA insurance, the DE underwriter enters his or her CHUMS ID number on the loan.

148.   The FHA and HUD can use these CHUMS ID numbers to monitor the performance of particular DE underwriters.

149.   To the extent that a DEL allows individuals who are not DE underwriters to underwrite FHA loans, this practice undermines the FHA and HUD's ability to monitor DE underwriter performance. The FHA and HUD have no way to monitor the performance of individuals who are not DE underwriters (*i.e.*, who have not been assigned a CHUMS ID number).

150.   Each DEL must submit a certification to the FHA and HUD for each loan that it approves for FHA insurance. These loan-level certifications are to be signed by one of the DEL's DE underwriters.

151.   The loan-level certifications are important as the FHA and HUD will rely on them for purposes of endorsing mortgages for FHA insurance, thereby eliminating the need for the FHA or HUD to review the loans prior to endorsement.

152.   A DE underwriter may underwrite an FHA loan in one of two ways: (1) manually; or (2) by using an FHA-approved automated underwriting system. The language

of the required loan-level certification differs depending on whether the loan is underwritten manually or using an FHA-approved automated underwriting system ("AUS").

153. If a DE underwriter uses an FHA-approved AUS, the DE underwriter must enter certain information regarding the loan into the AUS. The AUS will then process the information and rate the loan as either "accept"/"approve" or "refer"/"caution."

154. If a DE underwriter uses an FHA-approved AUS and the AUS rates the loan as either "accept" or "approve," the DE underwriter must make the following certification, in sum and substance:

> This mortgage was rated as an "accept" or "approve" by FHA's Total Mortgage Scorecard. As such, the undersigned representative of the mortgagee certifies to the integrity of the data supplied by the lender used to determine the quality of the loan, that a Direct Endorsement Underwriter reviewed the appraisal (if applicable) and further certifies that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program. I hereby make all certifications required by this mortgage as set forth in HUD Handbook 4000.4.

155. The certifications set forth in HUD Handbook 4000.4—which are incorporated by reference in the above loan-level certification—include the certification that "the mortgage complies with HUD underwriting requirements as contained in all outstanding HUD handbooks and Mortgagee Letters." The above loan-level certification, therefore, represents that the loan was underwritten with the level of due diligence required by all outstanding HUD Handbooks and Mortgagee Letters, and in accordance with the applicable HUD underwriting rules.

156. If a DE underwriter uses an FHA-approved AUS and the AUS rates the loan as either "refer" or "caution," or if a DE underwriter does not use an FHA-approved AUS, the DE underwriter must manually underwrite the loan and make the following certification, in sum and substance:

> This mortgage was rated as a "refer" by a FHA's Total Mortgage Scorecard, and/or was manually underwritten by a Direct Endorsement underwriter. As such, the undersigned Direct Endorsement underwriter certifies that I have personally reviewed the appraisal report (if applicable), credit application, and all associated documents and have used due diligence in underwriting this mortgage. I find that this mortgage is eligible for HUD mortgage insurance under the Direct Endorsement program and I hereby make all certifications required for this mortgage as set forth in HUD Handbook 4000.4

157.    In addition to representing that the loan was underwritten with the requisite due diligence and that the DE underwriter reviewed the property appraisal (if one was required), this loan-level certification for manually-underwritten loans also represents that the DE underwriter "personally reviewed . . . the credit application[] and all associated documents."

158.    The additional certification that the DE underwriter "personally reviewed . . . the credit application[] and all associated documents" is critical, as manually-underwritten loans frequently have one or more characteristics that suggest heightened risk.

159.    The above-described loan-level certifications ensure that a certain baseline level of care is applied to all loans before they are endorsed for FHA insurance.    These certifications make it possible for the FHA/HUD to delegate the authority to endorse loans for FHA insurance to DELs.

160.    Absent a truthful loan-level certification, a DEL is not entitled to endorse a particular loan for FHA insurance.    The FHA and HUD will not accept a loan for FHA insurance absent the required loan-level certification.

161.    At PHH, the underwriting process for all FHA loans—regardless of whether the loans are manually underwritten or underwritten using an FHA-approved AUS, is the same.

162.    The underwriting process begins when a borrower submits a loan application to PHH.  This is done electronically.  The borrower—or a loan correspondent or broker acting

on behalf of the borrower—uploads the loan application to PHH's proprietary "CASH" underwriting software system which is together with all of the supporting documentation. A PHH underwriter then accesses the loan application and supporting documentation using the CASH computer system and conducts an initial underwrite of the loan. At this stage, the underwriter may, among other things, reject the loan application or approve it with conditions.

163. If an underwriter approves a loan application with conditions, he or she enters the specific language of the conditions into CASH. All the conditions on a loan must be satisfied before the loan can close and be endorsed for FHA insurance consistent with HUD's underwriting rules.

164. The conditions on a loan could relate to any aspects of the loan, including the borrower's income, assets, or credit. For example, PHH's underwriter's would have to verify borrower's income levels by obtaining W-2's and obtaining verifications of employment from employers confirming a borrower's wages.

165. The vast majority of loans that PHH endorsed for FHA insurance were approved initially with conditions.

166. After a loan is approved with conditions, the borrower submits additional documentation to PHH in response to the conditions and/or PHH obtains additional documentation from individuals associated with the borrower, such as the borrower's employer.

167. The underwriting assistants that PHH used to review the documents to approve conditions were not DE underwriters. They did not have their CHUMS ID numbers, and PHH has not certified to the FHA that they possess the qualifications

necessary to be DE underwriters. In fact, many of the underwriting assistants employed by PHH did not possess the necessary qualifications to be DE underwriters. For example, many processors employed by PHH did not have at least three years full-time recent experience reviewing both credit applications and property appraisals. Nor did PHH ensure that its processors are reliable and responsible professionals skilled in mortgage evaluation.

168. If after reviewing a condition, an underwriting assistant determines that a condition has been satisfied (i.e., that the newly-obtained documentation is sufficient to satisfy the condition), he or she will clear the condition.

169. Once all the conditions on a loan have been cleared, a DE underwriter is notified. The DE underwriter will then sign the loan-level certification without reviewing the work performed by the processor in clearing conditions on the newly-obtained documentation on which the processors relied in clearing the conditions.

170. In clearing the conditions on a loan, the underwriting assistants review only: (1) the conditions identified by the DE underwriter, and (2) the new documentation obtained in response to those particular conditions. The underwriting assistants do not review the entire loan file. Accordingly, in clearing conditions, the underwriting assistants do not have a complete picture of the loan applications.

171. The vast majority of the loans that Defendants have endorsed for FHA insurance have had conditions that were cleared by underwriting assistants. Moreover, many loans had multiple conditions that were cleared by underwriting assistants and not by true DE underwriters.

172. Defendants' underwriting assistants not only clear most of the conditions on most of Defendants' FHA loans, but they clear conditions relating to all aspects of the loans.

Underwriting assistants have cleared conditions relating to the borrower's income, assets, and credit.

173.    For example, with respect to income, an underwriting assistant may review the borrower's pay stubs and W-2s to ensure, among other things, that the documents reflect an income level consistent with information obtained from the borrower's employer in connection with a Verification of Employment.  In addition, the underwriting assistant may review documents submitted to clarify the borrower's income (*e.g.,* a statement from the borrower's employer stating what income the borrower receives in the form of commissions and bonuses) to ensure, among other things, that the borrower's income is sufficient to meet his or her mortgage obligations.

174.    With respect to assets, an underwriting assistant may review documents submitted to explain large deposits (*e.g.,* gift letters) to ensure, among other things, that the borrower is not obligated to repay the amount of such deposits.   In addition, the underwriting assistant may review bank statements to confirm, among other things, that the borrower has sufficient cash reserves to cover his or her mortgage obligations.

175.    Finally, with respect to credit, an underwriting assistant may review documents submitted in connection with apparent debt (*e.g.,* a credit supplement) to determine, for example, whether a third party, and not the borrower, ultimately is responsible for the debt, or whether the debt has been paid off or is lower than is reflected in a credit report.   In addition, an underwriting assistant may review a statement from the borrower's landlord confirming that the borrower has consistently met their rent obligations (*e.g.,* a Verification of Rent) to ensure, among other things, that the borrower is creditworthy and likely to meet his or her mortgage obligations.

*Defendants Failed to Employ Properly Qualified and Adequately Trained Underwriters*

176.   Contrary to Defendants' certifications, including the individual certifications appearing on each and every mortgage endorsed by Defendants, Defendants failed to ensure that its underwriters were properly qualified and adequately trained to process loans in connection with the Government Programs.

177.   Defendants failed to provide its underwriters with adequate training regarding the proper standards and requirements in connection with processing Government Program loans.

178.   Additionally, on various occasions Defendants hired or promoted unqualified individuals to positions where they were responsible for underwriting loans for the Government Programs.

179.   In both situations, despite the fact that Defendants knew or should have known that its underwriters were not properly qualified and/or trained with respect to the applicable standards and guidelines, Defendants nonetheless improperly permitted those individuals to underwrite loans in connection with the Government Programs.

180.   Defendants knew or should have known that its certifications of compliance were false.   In the alternative, in falsely certifying compliance, Defendants acted with deliberate ignorance and/or reckless disregard of the truth.   In the alternative, Defendants' false certifications, as well as its failure to conduct proper due diligence, were reckless, grossly negligent and/or negligent.

181.   Defendants' false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of applicable standards and requirements, violated Defendants' fiduciary obligations and duty of care to the Government.

182.    Contrary to its annual and individual certifications, Defendants did not comply with applicable standards and requirements by failing to ensure that its underwriters were properly trained and/or qualified with respect to the Government Programs.   The following are some examples of the ways in which Defendants failed to employ properly qualified and trained employees.

183.    On several occasions, Defendants promoted untrained individuals to positions where they would be responsible for underwriting loans in connection with Government Programs before those individuals were properly trained or otherwise prepared to underwrite those loans.

184.    Defendants' underwriters repeatedly complained that they did not receive sufficient training, including in particular training regarding fraud.   Defendants' failure to provide underwriters with information regarding audit findings, as discussed further below, further prevented underwriters from gaining useful information and experience that would assist them in increasing and approving compliance with applicable standards and requirements.

185.    Defendants failed to provide underwriters with the requirements of the Government Programs, such as the HUD Handbook, or Fannie and Freddie Guidelines. Instead Defendants only provided underwriters with guidelines written by Defendants incorporating Defendants' own "overlays."

### Defendants Failed to Comply With Quality Control Requirements

186.    Contrary to Defendants' certifications, including the individual certifications appearing on each and every mortgage endorsed by Defendants, Defendants failed to ensure proper quality controls in accordance with applicable standards and requirements as well as

sound and prudent underwriting principles.

187.    Defendants knew or should have known that its certifications of compliance were false.   In the alternative, in falsely certifying compliance, Defendants acted with deliberate ignorance and/or reckless disregard of the truth.   In the alternative, Defendants' false certifications, as well as its failure to conduct proper due diligence, were reckless, grossly negligent and/or negligent.

188.    Defendants' false certifications, as well as its reckless, negligent, and grossly negligent conduct in violation of applicable standards and requirements violated Defendants' fiduciary obligations and duty of care to the Government.

189.    Contrary to its annual and individual certifications, Defendants did not maintain proper quality controls in accordance with applicable standards and requirements. The following are some examples of Defendants' pattern and practice of failing to conduct proper due diligence.

190.    Defendants failed to provide underwriters with information regarding material findings and other issues identified during internal audits, including those that arose in the context of a default or Early Payment Default.   This information would have assisted underwriters in avoiding repeated errors and in improving compliance with the standards and regulations set out by the Government Programs.

191.    In fact, Defendants' managers told underwriters that Defendants had determined not to provide that information to underwriters, including in particular information about loans that had defaulted, because Defendants did not want underwriters to "tighten up," meaning, for example, strictly adhering to the guidelines, adding conditions Defendants felt were unnecessary, and reviewing loans at a slower pace, all of which would

have resulted in the approval of fewer loans.

*Defendants' False Certifications Damaged the Government*

192.    Upon information and belief, the Government has paid thousands in insurance claims and other expenses relating to mortgages that participated in the Government Programs as a result of Defendants' false annual and/or individual certifications.    Upon information and belief, the Government would not have incurred these expenses absent Defendants' false certifications.

193.    For example, as of May 2013, HUD has paid millions in FHA insurance claims and related costs arising out of Defendants' approval of mortgages for FHA insurance.  HUD can additionally expect to pay millions of dollars in further FHA insurance claims as additional mortgages approved by Defendants default in the coming months and years.

194.    Defendants' false certifications were material and bore upon the likelihood that borrowers would make mortgage payments.

195.    The Government has therefore been damaged by Defendants' false claims and certifications.

## FIRST CAUSE OF ACTION
### *For Damages and Penalties Under the False Claims Act*
(31 U.S.C. § 3729(a)(1) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(A))

196.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

197.    As set forth above, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the quality of their loans at the time of their sale or insurance to the Government Programs, including that the loans were of investment quality and complied with the Government Program guidelines, selling guides, and purchase contracts.

198.   Defendants' misrepresentations about loan quality were capable of influencing and thus material to, the Government Programs' decisions about purchasing or insuring such loans.

199.   The Government Programs have incurred losses as a result of Defendants' misrepresentations in the form of paying guarantees to third parties after the affected loans defaulted.

200.   Treasury funds have been used to purchase or insure Defendants' loans and to reimburse the losses incurred by the Government Programs as a result of paying either insurance or guarantees to third parties after the loans purchased or insured from the Defendants defaulted.

201.   Treasury funds to the Government Programs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2), specifically, to prevent disruptions in the ability of mortgage finance.

202.   By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(A), for each of the loans sold to the Government Programs in violation of the Government Program requirements, Defendants knowingly, or acting in deliberately ignorance and/or in reckless disregard of the truth, presented a fraudulent claim for payment or approval.

203.   Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants is liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the Government Programs have sustained because of Defendants' actions.

## SECOND CAUSE OF ACTION
### *For Damages and Penalties Under the False Claims Act*
### (31 U.S.C. § 3729(a)(2) (2006), and, as amended, 31 U.S.C. § 3729(a)(1)(B))

204.   Plaintiff repeats and realleges the allegations above as if fully set forth herein.

205.   As set forth above, Defendants knowingly, or acting in deliberate ignorance and/or with reckless disregard of the truth, made false representations about the quality of their loans at the time of their sale or insurance to the Government Programs, including that the loans were of investment quality and complied with the Government Program guidelines, selling guides, and purchase contracts.

206.   Defendants' misrepresentations about loan quality were capable of influencing and thus material to, the Government Programs' decisions about purchasing or insuring such loans.

207.   The Government Programs have incurred losses as a result of Defendants' misrepresentations in the form of paying guarantees to third parties after the affected loans defaulted.

208.   Treasury funds have been used to purchase or insure Defendants' loans and to reimburse the losses incurred by the Government Programs as a result of paying either insurance or guarantees to third parties after the loans purchased or insured from the Defendants defaulted.

209.   Treasury funds to the Government Programs were used to "advance a Government program or interest," within the meaning of 31 U.S.C. § 3729(b)(2), specifically, to prevent disruptions in the ability of mortgage finance.

210.   By virtue of the acts described above, and in violation of 31 U.S.C. § 3729(a)(1)(B), for each of the loans sold to the Government Programs in violation of the

Government Program requirements, Defendants knowingly, or acting in deliberately ignorance and/or in reckless disregard of the truth, presented a fraudulent claim for payment or approval.

211.    Pursuant to the False Claims Act, 31 U.S.C. § 3729(a)(1), Defendants is liable to the United States under the treble damage and civil penalty provisions for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the Government Programs have sustained because of Defendants' actions.

### THIRD CAUSE OF ACTION
### *Violations of FIRREA*

212.    Plaintiff repeats and realleges the allegations above as if fully set forth herein.

213.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false individual loan certifications stating that loans were eligible for participation in Government Programs and that Defendants had complied with other requirements including maintenance of data integrity and/or due diligence.   Defendants submitted such false certifications using the mails and/or the wires in violation of 18 U.S.C. §§ 1001, 1006, 1014, 1341, and 1343.  Further, as part of Defendants' scheme to avoid informing the Government of the loan quality problems it was experiencing and to avoid requests by the Government for indemnification on individual loans, Defendants knowingly made numerous material fraudulent representations to the Government using the mails and/or the wires in violation of 18 U.S.C. §§ 1001, 1006, 1014, 1341, and 1343.

214.    Defendants made these statements to the Government with respect to the loans that it recklessly originated and underwrote, and with respect to the loans that Defendants failed to self-report, with the intent to defraud or deceive the Government into

endorsing loans that were ineligible for participation in the Government Programs, and to defraud or deceive the Government into paying insurance claims for loans that were not eligible for insurance.

215.    Accordingly, Defendants is liable to the Government for civil penalties as authorized under 12 U.S.C. § 1833a, in the amount of up to the greater of (i) $1 million per violation, (ii) the amount of loss to the United States, or (iii) the amount of gain to Defendants.

**WHEREFORE, Relator, on behalf of herself and the United States Government, requests the following relief:**

a.    A judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained as a result of Defendants' violations of the False Claims Act;

b.    A judgment against Defendants for a civil penalty of $10,000 for each of Defendants' violations of the False Claims Act;

c.    That Relator recover all costs of this action, with interest, including the cost to the United States Government for its expenses related to this action;

d.    That Relator be awarded all reasonable attorneys' fees in bringing this action;

e.    That in the event the United States Government proceeds with this action, Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action;

f.    That in the event the United States Government does not proceed with this action, Relator be awarded an amount for bringing this action of at least 25% but not more than 30% of the proceeds of the action;

g.    That a trial by jury be held on all issues so triable;

h.    An award of pre-judgment interest; and

i.    Such other relief to Relator and/or the United States of America as this Court may deem just and proper.

PLAINTIFF DEMANDS A JURY TRIAL.

Dated:    May 24, 2013

THOMAS & SOLOMON LLP

By: _____
     Michael J. Lingle, Esq.
     J. Nelson Thomas, Esq.
      *Attorneys for Relator*
     693 East Ave
     Rochester, New York 14604
     Telephone: (585) 272-0540
